**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Susan BROOKE, Defendant–Appellant.**

No. 92–10330.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 4, 1993.

Decided Sept. 20, 1993.

Carmen L. Fischer, Phoenix, AZ, for defendant-appellant.

Frederick R. Petti, Asst. U.S. Atty., Phoenix, AZ, for plaintiff-appellee.

Before FLETCHER, REINHARDT, and NOONAN, Jr., Circuit Judges.

## OPINION

REINHARDT, Circuit Judge:

Susan Brooke appeals her conviction on charges of conspiracy, manufacture of a destructive device (26 U.S.C. § 5861(f)), possession of a destructive device (26 U.S.C. § 5861(d)), and malicious damage to property resulting in personal injury (18 U.S.C. § 844(i)). At trial, the prosecution introduced extensive testimony that Brooke falsely told her friends and acquaintances that she suffered from and was undergoing treatment for cancer. Because the unfairly prejudicial nature of the false-cancer evidence substantially outweighed its limited probative value, and because we cannot say with fair assurance that its use by the government did not affect the jury's verdict, we reverse Brooke's conviction and remand.

### I

Brooke's convictions stem from the manufacture and delivery by co-defendant Rocky Kearney of a packaged pipe bomb, containing nicotine poison, to the residence of Melinda Howell on December 7, 1987. Howell suffered serious burns to her hands and face when she opened the package and the pipe bomb exploded.

In prosecuting Brooke, the government contended that she paid Kearney $2000 to build and deliver the bomb to Howell. Howell was dating Charlie Burk, with whom Brooke had previously had a long-term romantic relationship. Kearney, who pleaded guilty under an agreement reached in the month prior to trial, was the key government witness; his testimony was the only direct evidence linking Brooke to the charged crimes. In addition to Kearney, several of Brooke's friends and acquaintances testified, describing her reaction to Burk's relationship with Howell, her efforts to obtain information about Howell and the relationship, and her abortive attempts to have other single men lure Howell away from Burk.

At trial, Brooke, who testified in her own behalf, contended that she hired Kearney, a private investigator, merely to help in determining whether Howell was responsible for several harassing telephone calls Brooke had received. Brooke further maintained that she neither knew of nor solicited the production and delivery of the pipe bomb.

On appeal, Brooke challenges the admission of evidence that she falsely claimed to have cancer. She also argues that the district court erred in limiting her cross-examination of Kearney, the main government witness.

## II

In its trial brief, the government indicated its intention to "provide evidence of defendant's manipulative behavior concerning friends and acquaintances which was based on allegations that she suffered from terminal cancer," and stated that it would "establish that these allegations were nothing more than a cruel hoax designed to gain sympathy for the defendant while influencing her friends to cater to her needs."

Brooke moved in limine to exclude all evidence that she had cancer or that she informed others that she suffered from the disease. On the first day of trial, the district court granted the motion in part, excluding such evidence except "to the extent that it is involved as a means whereby the defendant may have sought sympathy from and/or fa-

vors from acquaintances of hers." Despite this putative limitation, the government introduced through several witnesses, both in its case in chief and on rebuttal, a significant amount of testimony that Brooke falsely claimed, both before and after the bombing, to have cancer.

Several of Brooke's acquaintances testified that she told them she had cancer; some testified that she later claimed to have been miraculously cured while others testified to having no knowledge of Brooke's supposed recovery. Government questioning and witnesses' answers conveyed the prosecution theory that the cancer claims were a "cruel hoax." Most of these acquaintances also testified to Brooke's efforts to obtain information about Howell. However, the government failed to elicit testimony from all but one or two of these witnesses that Brooke's cancer claims were made as part of an effort to obtain sympathy or to cause them to perform favors that they would not otherwise have performed. Kearney, on the other hand, did testify that, in addition to receiving a $2000 payment, sympathy for Brooke's "cancer story" played a role in his agreeing to build and deliver the bomb to Howell.

In its case in chief, the prosecution also introduced testimony that Brooke improperly used funds provided for cancer treatment to purchase airline tickets for her friends. Additional government evidence suggested that Brooke's claims of cancer were false, including the rebuttal testimony of medical records custodians from two facilities where Brooke claimed to have received treatment. The custodians testified to finding no record that Brooke had ever been a patient.

In response to the government's exploration of the issue, Brooke presented testimony to prove that she had in fact suffered from cancer. Among the witnesses she called was her accountant, who testified to the medical expenses reflected in her 1987 tax return. In cross-examination of the accountant and of Brooke herself, the government elicited testimony that Brooke had undergone breast augmentation surgery during 1987, and that

she wrongfully deducted that expense on her tax return.[1]

## A

Brooke argues that evidence that she feigned cancer is character or propensity evidence, inadmissible under Fed.R.Evid. 404. Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but permits the admission of other-acts evidence for purposes other than showing character or propensity. Furthermore, like all evidence, in order to be properly admitted, other-acts evidence must be relevant, and its probative value must not be substantially outweighed by unfair prejudice. *See* Fed.R.Evid. 401 advisory committee note (Rule 404 is "illustration[ ] of the application of the present rule as limited by the exclusionary principles of Rule 403"); *United States v. Bailleaux*, 685 F.2d 1105, 1110 (9th Cir.1982).[2]

Thus, we must determine whether the false-cancer testimony has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. We do so in light of Rule 404's dictate that the evidence must be probative of an issue other than character or propensity. *See Huddleston v. United States*, 485 U.S. 681, 686, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988). If the evidence passes the initial test, we must then consider both its probative value and its prejudicial effect, and determine whether the district court abused its discretion in deciding that the

former was not substantially outweighed by the latter. *See, e.g., United States v. Herrera–Medina*, 609 F.2d 376, 379 (9th Cir.1979) (standard of review).

At trial, the government must show how evidence is relevant; "specifically, it must articulate precisely the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence." *United States v. Mehrmanesh*, 689 F.2d 822, 830 (9th Cir.1982); *see also United States v. Arambula–Ruiz*, 987 F.2d 599, 602–03 (9th Cir. 1993) (quoting *Mehrmanesh* ). Because the district court heard argument on Brooke's cancer-evidence motion off the record in chambers, the trial transcript does not show clearly the government's evidential hypothesis. However, Brooke does not contend that the government failed to make the required "precise articulation." Despite the absence of a complete record of that articulation, our review of the district court record and trial transcript suggests two bases offered by the government for admission of the false-cancer evidence. We consider each in turn.

### 1

We begin by addressing the propriety of admitting the false-cancer evidence as bearing on Brooke's credibility. At the end of the trial, the government focused its arguments to the jury upon the impeachment value of the false-cancer evidence. However, the Federal Rules of Evidence foreclose any government theory that the false-cancer evidence was properly admitted to impeach Brooke's credibility.

1. Brooke contends that the cosmetic surgery deduction was lawful. As it has no effect on our decision, we express no opinion on the deduction's legality.

2. We have identified four prerequisites for the admission of other-acts evidence. *See, e.g., Bailleaux*, 685 F.2d at 1109–10. We have also made clear that meeting these four prerequisites does not suffice to make such evidence admissible; rather, we have consistently emphasized that probative value must always be balanced against unfair prejudice as required by Fed.R.Evid. 403. This analytical scheme sometimes makes it difficult to determine whether a challenge to admitted evidence rests upon Rule 403 or Rule 404(b).

*See, e.g., United States v. Khan*, 993 F.2d 1368, 1377 & n. 8 (9th Cir.1993) (Rule 403 balance is separate from Rule 404(b) and crux of appellant's argument is in former despite citation of latter). Ultimately, formal allocation, unlikely to affect the result in any case, is both futile and unnecessary. Here, for example, our decision would be the same regardless of classification under Rule 404(b) or Rule 403. Both parties contend that the false-cancer evidence was 404(b) evidence, but we focus on prejudice and probativeness because these are the evidentiary issues disputed by the parties. In our view, it matters not at all which rule "formally" controls this appeal.

Despite its in limine ruling on the limited relevance of the cancer testimony, the district court instructed the jury that it could consider evidence regarding Brooke's cancer and cancer treatment in "deciding whether or not to believe the defendant's testimony, and how much weight to give it." Consistent with this instruction, in closing argument and summation, the government emphasized the cancer evidence in vigorously attacking Brooke's credibility. For example, in specific reference to the medical records testimony offered in its rebuttal case, the government argued to the jurors that "you wanted that proof and you wanted to find out from these hospitals if in fact this woman was lying to you, because that plays a big role in how much credibility you are going to attach to her testimony." [3] "Cancer and credibility" was the recurrent theme in the government's argument to the jury. This strategic focus was sensible because, despite seven days of trial and the testimony·of numerous witnesses, the trial evolved into a credibility contest between Brooke and Kearney. Kearney's testimony was the most significant prosecution evidence—the only direct evidence—and Brooke unequivocally contradicted his testimony.

◼ Nonetheless, the law is clear; the cancer evidence could not properly be admitted to impeach Brooke's credibility. Fed. R.Evid. 608(b) provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the wit-

ness' credibility ... may not be proved by extrinsic evidence." Under this explicit rule, the government was stuck with whatever response Brooke gave about her cancer; the government "could attempt on further cross examination to elicit a response ... contradicting [her] prior testimony, but it could not properly impeach [Brooke] through extrinsic evidence." *United States v. Bosley*, 615 F.2d 1274, 1276–77 (9th Cir.1980).

Thus, admission of the copious testimony of Brooke's acquaintances regarding her cancer claims, and of the rebuttal witnesses' denial of the existence of medical records, cannot properly rest upon their utility in impeaching Brooke's credibility.[4] Some independent theory of relevance must support the use of the "cancer" evidence if its admission is to be upheld.[5] *See United States v. Abel*, 469 U.S. 45, 56, 105 S.Ct. 465, 470, 83 L.Ed.2d 450 (1984) (evidence inadmissible to impeach credibility under Rule 608(b) may nonetheless be admitted for another purpose).

2

◼ We next consider the theory of relevance offered by the government in its trial brief and endorsed in the district court's denial of Brooke's motion in limine. In the government's view, Brooke was jealous of Howell and used fallacious cancer claims to convince others, including Kearney, to spy on Burk and Howell and to disrupt their relationship. Consistent with this theory, the

3. Among other government arguments linking cancer and credibility were the following:

"She's never had the cancer that she claimed, stomach cancer. It was a big hoax. It was a big fraud. And the thing that's important about that, ladies and gentlemen, because she's not on trial here as to whether or not she had cancer. But her credibility, once she took that witness stand is."

"Ladies and gentlemen, I would commend Mr. Brandenburg on his ability to completely side-step the issue of his client's credibility and how it was completely shot down on this cancer issue."

"How does the old saying go? Oh, what a tangled web we weave. She's been living a lie for so long, she can't even keep them straight. She can't keep her testimony straight, she can't keep her statements straight, she can't keep her cancers straight."

4. We note that, even if Rule 608(b) did not *legally* foreclose credibility as a basis for admission of

*any* of the cancer evidence, as a matter of logic, Brooke's credibility could not serve as a basis for the admission of testimony in the government's case in chief, prior to the prosecution's knowing whether Brooke would take the stand at all.

5. As discussed at greater length below, the misuse of the false-cancer evidence as bearing upon Brooke's credibility overwhelmed the evidence's introduction for any legitimate purpose. Moreover, as we conclude below, under the government's other theory of relevance, the cancer evidence had only slight probative value, which was substantially outweighed by unfair prejudice. Thus, we need not base our decision on the ground that the impropriety of linking the false-cancer evidence to credibility so poisoned the trial as to require reversal regardless of *any* possible relevance of the cancer evidence.

district court's ruling on Brooke's motion in limine allowed the admission of the cancer evidence as proof of how Brooke sought to elicit sympathy and favors from her acquaintances. While we acknowledge some relevance to the false-cancer evidence under this theory, we conclude, in part because of the government's indiscriminate introduction of false-cancer testimony, that its probative value was slight.

The requirement of government articulation of an evidential hypothesis to support the contested admissibility of other-acts evidence does not impose a mere stationary barrier that once overcome may be ignored without consequence. Rather, the requirement defines an evidentiary course for trial to which the government must adhere. This rule applies with particular force where, as here, the district court has placed limits upon the admissibility of particular evidence through an in limine ruling.

Here, the government introduced much false-cancer testimony without linking it to its announced purpose—showing that Brooke used her false cancer story to convince her friends and acquaintances to spy on or disrupt the relationship of Howell and Burk. Indeed, because the prosecution appears to have elicited false-cancer evidence rather indiscriminately, its failure to elicit testimony from certain witnesses suggesting *any* connection between Brooke's cancer-feigning and her alleged efforts to disrupt the relationship of Howell and Burk was foreseeable and inevitable. For example, testimony by Burk that Brooke told him she had cancer in 1985, before the two broke off their relationship, and his testimony about later events suggesting the falsity of these claims, obviously have no relevance to Brooke's 1987 efforts, after her break-up with Burk, to spy on or disrupt Burk's relationship with Howell. The same is true of testimony by Burk's ex-wife, with whom Brooke was friendly, that Brooke told her she had cancer well *after* the bombing.

Finally, the government elicited extensive cancer testimony from a close friend of Brooke's who had met Burk only once, and was thus incapable of rendering any assistance to Brooke in obtaining information about Howell and Burk. Even with witnesses whose testimony centered around Brooke's requests for sympathy and assistance in relation to Burk and Howell, the government generally failed to connect, other than temporally, Brooke's cancer claims with her requests for assistance. As presented by the government through its witnesses, the false-cancer evidence supports an inference of consistent and pathological dishonesty rather than calculated manipulation directed toward a particular goal of disrupting the ongoing relationship of her ex-boyfriend.

Even as to those witnesses where some connection between cancer claims and sympathy or favors was established, the probative value of the false-cancer evidence was extremely limited. In its trial brief, the government argued that evidence of Brooke's cancer claims "is inextractable from the motivation of many witnesses in assisting" Brooke. The motivation of others to assist the defendant in matters other than the commission of the crime in question is generally not highly probative of the defendant's guilt or innocence of the charged offenses, even when the assistance is in connection with activities related in some manner to those offenses. Here, the government introduced the testimony of Brooke's friends and acquaintances to establish her jealousy of Howell as demonstrated by her requests to spy on and disrupt Howell's relationship with Burk. The government could have shown that she sought such help without introducing evidence of *how* she convinced or attempted to convince others to render the assistance. At best, the means employed by Brooke to elicit the help of others, and their motivation in helping her to interfere with the Burk–Howell relationship by *non-criminal* means, is mere background, having some *slight* tendency—like all testimony that "fills out the scene" of more relevant and significant occurrences—to make the witness' testimony more believable.[6] The true probative

---

6. If evidence of Brooke's cancer claims has some probative value as background testimony, independent evidence that the claims were false has

*no* value in filling out the scene. The government's theory that Brooke's friends and acquaintances were motivated to help her by her cancer

value of the testimony lies in the *fact,* and not the *manner,* of Brooke's having sought the witness' assistance. Indeed, we note that the government introduced several witnesses who testified that Brooke sought aid in breaking up Burk's relationship with Howell but did not suggest that she tried to enlist their assistance by claiming to have cancer. Nonetheless, we cannot state that the cancer testimony, as background evidence was without any probative value.[7]

Recognizing that there is *some* probative value in testimony by witnesses that Brooke told them she had cancer and then asked them to spy on or disrupt the Burk–Howell relationship, we nonetheless must conclude that such value is slight. Our conclusion rests both on the government's failure to adequately connect much of the false-cancer testimony to the theory on which the district court ruled it admissible and on the limited relevance of testimony regarding "motivation" of persons whom Brooke sought to, or did, persuade to assist her in non-criminal conduct.

### B

Our conclusion that the cancer evidence had some probative value does not end our inquiry. The trial court must exclude evidence, even if relevant, if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. Fed. R.Evid. 403, 404(b); *United States v. Miller,* 874 F.2d 1255, 1268 (9th Cir.1989); *United States v. Hodges,* 770 F.2d 1475, 1479 (9th Cir.1985). Moreover, "[w]here the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice." *United States v. Hitt,* 981 F.2d 422, 424 (9th Cir.1992). The likelihood of unfair prejudice was far greater than modest in this case.

Evidence that Brooke feigned a serious illness presents a great danger of "provok[ing] an emotional response in the jury or otherwise tend[ing] to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to [her] guilt or innocence of the crime[s] charged." *Bailleaux,* 685 F.2d at 1111. The government implicitly acknowledged and openly exploited this pronounced danger of unfair prejudice when it argued in its closing summation:

> And think of your own lives, your own common experiences, your own common sense. And if you have a friend that tells you, "I'm dying of cancer," I mean that's pretty significant. Those are pretty harsh

---

claims depends on the inference that they were not aware *at the time she sought their assistance* of the fallacy of the claims. Therefore, testimony that a witness came to doubt the sincerity of Brooke's cancer claims would not help to fill out the prior scene. Of course, it is understandable that the government, having introduced testimony that Brooke told her friends and acquaintances that she had cancer, would apprehend some quantum of juror sympathy for a defendant suffering from the serious disease. The story that allegedly induced such pity in a hardened character like Rocky Kearney would almost certainly have a similar, if not more profound, effect upon the jury. To eliminate the foundation for this sympathy, the government naturally would desire to prove that her compassion-inducing cancer claims were false. However, our rules of evidence do not provide the government with the right to neutralize pro-defendant sympathy—created by the government's own evidence—through the introduction of otherwise irrelevant evidence. Like all litigants, the government must accept the consequences of its strategic decisions. If the prosecution chooses to introduce evidence that the defendant claimed to suffer from cancer, it must live with the possibility, however strong, of juror sympathy for the defendant.

7. We need not consider what our ruling would be as to the admissibility of Kearney's testimony that Brooke's cancer claims partially motivated his decision to build and deliver the bomb, were that the only cancer evidence adduced. Here, the false-cancer evidence introduced by the government was pervasive. Even if Kearney's testimony were properly admitted, the additional cancer evidence was not merely cumulative; rather it overwhelmed Kearney's testimony. Moreover, the improper employment of the cancer evidence to impeach Brooke's credibility is a significant error independent of the limited relevance of the cancer evidence to show the motivations of others, including Kearney. Finally, if Kearney's cancer-claims testimony were properly admitted in order to show his motivation, and thus to make his testimony more credible, evidence that the claims were false would not be. As noted above, to credit his statement that cancer claims influenced him, we must assume he considered the claims to be genuine at the time. Whether or not he later came to doubt their veracity is irrelevant to the testimony regarding his motivation.

words. And if you believe that person, that's normal because lying about having cancer is almost incomprehensible. Why would someone do that? ... How can someone do that?

If anything, the government's assessment is understated. Feigning cancer is likely entirely incomprehensible to most of society; it is the type of behavior that provokes a strong negative reaction. Because of the unfortunate ubiquity of genuine suffering from cancer, a dreaded and serious disease, this particular species of interpersonal fraud is all the more unusual. Even those with few scruples about honesty would generally avoid such a fabrication. Lying about having cancer is a particularly egregious violation of social convention, likely to provoke an instinct to punish separate and apart from any relation of the fraud to the elements of the charged crimes. People tend to convey the anger felt toward the disease—an unresponsive target of our emotion-laden wrath—in heightened resentment toward anyone who would undeservedly seek the sympathy reserved for those suffering from this often fatal disease.

Because of this instinctive resentment, evidence that someone feigned cancer is likely to "have a visceral impact that far exceeds [its] probative value." *Hitt*, 981 F.2d at 424. That unfair impact is heightened where the improper evidence is extensive. The potential for unfair prejudice increases proportionately with the amount of such evidence. Here, false-cancer evidence pervaded the trial. Evidence that Brooke falsely told others she suffered from cancer posed a great danger of prejudicing the jury against her for reasons wholly apart from her guilt or innocence of the offenses with which she was charged.[8] *See United States v. Brown*, 880 F.2d 1012, 1014 (9th Cir.1989); *Hodges*, 770 F.2d at 1480. This significant possibility

substantially outweighs the marginal probative value of the cancer evidence.

■ We review claims of evidentiary error under an abuse of discretion standard. That means, of course, that a district court's evidentiary rulings are always subject to appellate review, and that we have an obligation to assess carefully the trial court's adherence to legal principles. Where the ruling is clearly in error—where we have a definite and firm conviction of error—we must conclude that the district court has abused its discretion. Here, the district court unquestionably abused its discretion in admitting evidence regarding Brooke's false cancer claims.

We have considered the extensiveness of the false-cancer evidence, the manner of its introduction, and the nature of the government's arguments to the jury concerning its significance. On review of the record, it is difficult to conclude that the government's purpose in offering that evidence was anything other than to portray Brooke as manipulative and dishonest, and to persuade the jury that she deserves to be punished for her particularly opprobrious brand of manipulation.[9] This is obviously an improper purpose. Recently, in another case in which the prosecution introduced evidence clearly designed to prove a character trait of the defendant, we reminded the government of its duty to avoid improper methods in seeking convictions. *See United States v. Hill*, 953 F.2d 452, 458 (9th Cir.1991). We reconvey that reminder here, and hope that the need for such reminders will abate in the future.

### C

Having determined that the district court abused its discretion in admitting the false-cancer evidence, we have no difficulty in concluding that the error was not harmless

---

8. Some of the cancer evidence had further potential for unfair prejudice, *independent* of its relation to feigning a serious disease. Evidence that Brooke took an unwarranted tax deduction, that she misused funds provided for medical treatment, and that she underwent breast augmentation surgery each possesses a danger of inducing an emotional response unconnected to its probativeness of any material issue, and unconnected to the opprobriousness of cancer-feigning.

Nonetheless, because this evidence would almost certainly not have been introduced or admitted but for the false-cancer issue, we do not address its separate potential for prejudice.

9. In its opening statement, the government told the jury, "you will hear the story, ladies and gentlemen, of a vindictive, manipulative, and dangerous woman, a fatal attraction."

under either formulation of the standard for nonconstitutional harmless error employed in our precedent—"fair assurance" or "more probable than not." In *Hitt,* 981 F.2d at 425, we suggested that there might be a conflict in our use of these two different phrases on different occasions. However, on further reflection, it is apparent that no conflict can or does exist. The Supreme Court established the applicable standard in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and we did not and do not have the authority to modify it. Therefore, although we have sometimes used a different phrase to describe the standard, its content must be what the Supreme Court proclaimed it to be. The term "fair assurance" defines that content, and it is a readily understandable phrase. There is no reason, under ordinary circumstances, to go beyond that terminology in conducting our harmless error analysis.

In any event, we would view any argument that admitting the cancer evidence was harmless "with some skepticism" in light of the government's strategic decision to introduce that evidence despite its obvious "doubtful utility." *See Hill,* 953 F.2d at 459. Several attributes of Brooke's trial support our conclusion that the error was not harmless. As we stated earlier, the trial centered around the conflicting testimony of Kearney and Brooke. The cancer evidence reflected upon the character and credibility of Brooke, and in all likelihood affected the jury's determination of which of the two antagonists to believe. Moreover, the district court's limiting instruction exacerbated the error by inviting the jury to consider the cancer evidence in evaluating Brooke's credibility. *Cf. Hill,* 953 F.2d at 458 (rejecting limiting instruction as supporting harmlessness of error where instruction "served only to limit the jury's consideration to an irrelevant and prejudicial point"). Finally, the government made continued references to the cancer evi-

dence in its closing arguments. *Cf. Brown,* 880 F.2d at 1016 (continued references in government closing "make it impossible" to find error harmless).

Aside from its possible effect on the pivotal issue of Brooke's credibility, the volume of testimony and evidence relating to Brooke's cancer claims threatened to overwhelm the evidence relating to the charged crimes, heightening the danger that conclusions about Brooke's alleged manipulativeness tipped the balance against her. We hesitate to use the obvious, but nevertheless apt, metaphor. Like an evidentiary cancer, the erroneously-admitted evidence infected the testimony of nearly every witness. Brooke is entitled to a trial cured of such a pervasive defect.

### III

Although we must reverse and remand on the basis of the erroneous admission of the cancer evidence, because the issue is likely to arise again if Brooke is retried, we offer some guidance concerning her challenge to the limitation of her cross-examination of Kearney.

█ Prior to calling Kearney, the district court granted a government motion to preclude any cross-examination as to his August 1987 arrest for aggravated auto burglary.[10] Brooke intended to question Kearney regarding the incident because of a perceived parallel with the bombing in this case. In her offer of proof, Brooke asserted that, at the time of his earlier arrest, Kearney told the officers he was investigating a case for a client when, in fact, he was not. Brooke argued that this false statement on arrest calls into question his assertion that he was working for a client, Brooke, when he built and delivered the bomb to Howell.

---

**10.** In moving to exclude any cross-examination about the 1987 arrest, the government argued that Fed.R.Evid. 609 precluded such questioning. This basis for exclusion was erroneous. Rule 609 addresses the admissibility of evidence of convictions "[f]or the purpose of attacking the credibility of a witness." The rule does not purport to address or resolve the admissibility of

cross-examination regarding arrests, particularly where such questions do not relate to general credibility but to specific information elicited on direct. *United States v. Alvarez–Lopez,* 559 F.2d 1155, 1158 (9th Cir.1977) (question to paid government informant regarding prior narcotics arrest wrongly excluded).

The district court also prevented Brooke from asking Kearney whether he had ever bragged that a man named Tony Spalatra had a contract out on him that was rescinded when Spalatra died in a car bombing. Brooke contends that Kearney's response to this question would have impeached his statement that he had not been involved with any other bombings.

Both the statement following his 1987 arrest and any boasting about the bombing of another person tend to impeach the credibility of significant parts of Kearney's testimony and suggest that he may have been acting on his *own* accord in building and delivering the bomb. The questions the district court disallowed call into question Kearney's testimony that he prepared and delivered the bomb in exchange for $2000 paid by Brooke. This testimony encompassed the central dispute at trial. Had Brooke succeeded in raising a reasonable doubt in the jurors' minds as to whether Kearney acted alone, she would have been acquitted.

Without ruling on the purported errors, we have serious reservations concerning the government's contention that the scope of cross-examination allowed Brooke was sufficient.[11] We have previously pointed out that "[w]hen the case against a defendant turns on the credibility of a witness, the defendant has broad cross-examination rights." *United States v. Ray*, 731 F.2d 1361, 1364 (9th Cir. 1984). We cannot overemphasize the importance of allowing full and fair cross-examination of government witnesses whose testimony is important to the outcome of the case. Out of necessity, the government frequently relies on witnesses who have themselves engaged in criminal activity and whose record for truthfulness is far from exemplary. These witnesses often have a major personal stake in their credibility contest with the defendant. Full disclosure of all relevant information concerning their past record and

activities through cross-examination and otherwise is indisputably in the interests of justice. Ordinarily, such inquiries do not require the expenditure of an inordinate amount of time, and courts should not be reluctant to invest the minimal judicial resources necessary to ensure that the jury receives as much relevant information as possible. Nor should unwarranted fear of juror confusion present any impediment. Federal jurors, who are expected to follow the complex testimony and even more intricate instructions that are presented in many of our criminal cases, such as multiple conspiracy prosecutions, are unlikely to be confounded by a defendant's inquiry into the bias and credibility of a key government witness. In any retrial, the district court should afford Brooke a full and fair opportunity to question Kearney regarding any of his past activities that are probative as to the credibility of his testimony or as to any bias that may underlie it.

## IV

Because the district court erroneously admitted evidence that Brooke falsely claimed to suffer from cancer, and this evidence pervaded her trial, we reverse and remand for proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

11. It is true that Brooke was permitted to cross-examine Kearney about his plea agreement, but information suggesting *sole* responsibility for a crime brings out a concrete *reason* for fabricated testimony—diverting sole responsibility for the criminal act—and impeaches a witness' testimony far more directly than does simple presentation of the witness' plea-bargained benefits. A defendant is entitled to cross-examine a government witness regarding *why* the witness might be biased. *See Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974). The rules of evidence do not (and could not) curtail this right. *See United States v. Ray*, 731 F.2d 1361, 1364 (9th Cir.1984).