105 F.3d 667
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ronald FAURIA, Defendant-Appellant.
 No. 94-50444.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 8, 1996.
Decided Jan. 8, 1997.
 
 On Appeal from the United States District Court for the Central District of California, Los Angeles, D.C. No. CR-94-00071-DT; Dickran M. Tevrizian, Jr., District Judge, Presiding.
 C.D.Cal.
 REVERSED.
 Before: BRIGHT*, SKOPIL, and WIGGINS, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 A jury convicted Ronald Fauria, Vice President of Orange Coast Title Company, of one count of bank fraud in violation of 18 U.S.C. § 1344. The district court sentenced him to a three-year term of probation, a $2,500 fine, 600 hours of community service and a $50 special assessment. Fauria appeals. For reasons stated below, we reverse and remand for a new trial.
 
 
 3
 The trial included co-defendant Richard Annigoni, Executive Vice President of Par Western Interest, Inc. (PAR), and the jury found both defendants guilty of bank fraud. Annigoni separately appealed and the decision on his appeal controls in part our disposition of Fauria's case.
 
 
 4
 Initially, a panel of this court affirmed Annigoni's conviction. The panel rejected claims that the district court committed prejudicial error by limiting the cross-examination of a prosecution witness and by denying Annigoni's exercise of a peremptory challenge towards an Asian juror because of a Batson objection. United States v. Annigoni, 68 F.3d 279 (9th Cir.1995).
 
 
 5
 This court thereafter granted a rehearing en banc on the peremptory challenge issue. In a divided opinion (8 to 3), this court ruled that the trial court erroneously deprived Annigoni of a right of a peremptory challenge, and this error required automatic reversal and a new trial. United States v. Annigoni, 96 F.3d 1132 (en banc) (9th Cir.1996).
 
 
 6
 Defendant-Appellant Fauria on appeal raises the same issues as Annigoni, as well as several other contentions. We reverse Fauria's conviction and remand for a new trial because the district court erroneously rejected a peremptory challenge to a juror. We are bound by Annigoni on this issue. Because of the new trial determination, some of the other issues relating to trial errors need little mention. Fauria raises the following other issues on his appeal:
 
 
 7
 A. Was the evidence insufficient to support Fauria's conviction for bank fraud?
 
 
 8
 B. Did the district court erroneously deny the defendant's motion to dismiss for pre-indictment delay?
 
 
 9
 C. Did the district court abuse its discretion in failing to sever Fauria's trial from his co-defendant?
 
 
 10
 D. Did the district court erroneously restrict impeachment and cross-examination of a key government witness, Mary Ann Gigure?
 
 
 11
 E. Did the district court err in its supplemental instructions in response to four jury questions?
 
 
 12
 F. Did the district court err in making several evidentiary rulings: 1) allowing the Government's exhibit relating to an invested partnership into evidence and disallowing the defendant's exhibit relating to the same issue into evidence; and 2) disallowing evidence that Annigoni was in jail just prior to the close of escrow?
 
 
 13
 We shall not comment on issues of severance, instructions and evidentiary rulings. These are the kind of matters that either may be renewed at retrial under changed circumstances or, as to some issues, are unlikely to even arise again.
 
 I. BACKGROUND
 
 14
 The background facts have been related with respect to Annigoni in two appellate opinions, supra. These essential facts also apply to Fauria.
 
 
 15
 Annigoni worked with two necessary confederates: James Perumean, a dentist and real estate investor, and Ronald Fauria, a senior vice-president of Orange Coast Title company. Manipulation of the escrows at the title company was essential to Annigoni's plan, which depended on barefaced falsifications and the quick transfer of cash. He set up a partnership in which his and Fauria's interests were concealed and Perumean appeared as the front man. Perumean approached the United California Savings Bank (the Bank) for a loan. Perumean told the Bank that the partnership had the opportunity to buy 401 [sic] N. Brookhurst Street in Anaheim, California, for $4 million. He represented that the owner was Par Western Interests, Inc., a company owned by Annigoni, and that a loan of $2.85 million would be needed to acquire the title from Par Western and to pay off the holder of the first trust deed, the Prudential Insurance Company. He assured the Bank that it would get a first trust deed as security. The Bank agreed to make the loan.
 
 
 16
 Annigoni's company, Par Western, in fact, did not own 501 N. Brookhurst; but it arranged to acquire it on the same day that the sale to the Perumean-fronted partnership was to occur. Fauria set up a double escrow where two closings occurred almost simultaneously. In Escrow One, title to 501 N. Brookhurst was purportedly delivered to the partnership by Annigoni's company. In Escrow Two, the Bank's wire for $2.85 million was disbursed, with payments being made of $1.84 million to the actual owner of 501 N. Brookhurst and the rest going to Fauria, Annigoni's wife, Annigoni's in-laws and Annigoni's lawyers. The Prudential was never paid off. The Bank was duped by falsified documents and discovered the fraud only two years later when the borrowers of the $2.85 million defaulted on the loan and the Bank discovered it had no valid first deed of trust.
 
 
 17
 Annigoni, 68 F.3d at 280.
 
 
 18
 The fraud remained undiscovered for two years because these defendants continued making payments on the Prudential loan. The Government introduced documentary evidence of the transactions. In addition, Perumean and Mary Ann Gigure, the escrow officer of Orange Coast Title Company (Fauria's organization), testified for the Government.
 
 
 19
 The trial court rejected Fauria's pretrial motions to sever his case from the co-defendant and post-trial motions for a new trial.
 
 II. DISCUSSION
 Sufficiency of the Evidence
 
 20
 In contending that the Government produced insufficient evidence for conviction of bank fraud, Fauria relies on the return of a not guilty verdict on Count 3 of the indictment, the aiding and abetting charge. That count asserted the making of a false statement to the United California Savings Bank (UCSB) by sending it a false report that PAR held legal title to the 501 building.
 
 
 21
 Because of this result, Fauria asserts that the jury disbelieved witness Mary Ann Gigure on this issue. Fauria also asserts the Government showed through documents that Fauria had used Perumean to get a loan and then got rid of him after the loan closed. This latter assertion apparently is not true according to corrected documents. See p. 7, infra. This argument indicates only a question concerning Fauria's activities and his intent.
 
 
 22
 The Government summarized and referenced the evidence submitted against the defendant:
 
 
 23
 Defendants [sic] claims there was insufficient evidence from which a trier of fact could have concluded defendant was guilty. To the contrary, there was more than sufficient evidence presented at trial to convict defendant of bank fraud. The documentary evidence against defendant corroborated and was consistent with the witness testimony. Evidence presented against defendant during trial included: (1) the May 1986 meeting during which defendant told Annigoni and Perumean he did not want UCSB to know about his involvement in the transaction; (2) defendant's own handwritten notes on the title documents authorizing the transaction to close and record without sufficient funds in escrow; (3) defendant's involvement in the closing as described by witnesses such as Itzel [President of UCSB] and Gigure; (4) statements defendant made to Mary Ann Gigure about his intent not to pay off the Prudential loan; (5) Ron Nettles' testimony concerning the tax benefits that defendant took as a result of being a partner in 501 Ltd.; and (6) defendant's inexplicable receipt of approximately $120,000 of the proceeds from the UCSB loan.
 
 
 24
 Although defendant was not the title officer of OCT [Orange Coast Title Company] assigned to the file, he personally issued the title insurance policy which represented to UCSB that it had a first trust deed on the 501 Building when, as defendant knew, Prudential Insurance Company still had the first trust deed. Although defendant's own handwritten notes in the title file showed he knew there was not enough money to close escrow and pay off the Prudential loan, he failed to disclose this to UCSB. Although defendant testified at trial that Mary Ann Gigure had made a mistake and closed the escrows without sufficient money to pay off the existing lien in favor of Prudential Insurance Company, the evidence showed that several hundred thousand dollars from the proceeds went to the benefit of Annigoni and defendant. Defendant not only instructed Ms. Gigure to make the disbursements from escrow but he also signed all the checks. Ms. Gigure received no monetary benefit from the transaction aside from her normal escrow officer's fee of $460 for Escrow 4590 and $345 for Escrow 4601.
 
 
 25
 Appellee's Brief at pp. 32-33.
 
 
 26
 The Government also observes that defendant made numerous false or inconsistent statements to law enforcement authorities.
 
 
 27
 Finally, the Government contends that the fraud count encompasses the entire scheme to defraud and does not necessarily demonstrate an inconsistency with the not guilty verdict on Count 3.
 
 
 28
 Fauria does not take issue with the factual allegations asserted by the Government to support the convictions. See generally Appellant's Reply Brief.
 
 
 29
 We have examined the record references set forth in the Government's brief. They are accurate and support the view that the Government offered sufficient evidence to support the conviction. Moreover, an inconsistent verdict on one count does not necessarily mean the jury rejected the facts supporting a conviction on a different count. See United States v. Hughes Aircraft Co., 20 F.3d 974, 977 (9th Cir.), cert. denied, 115 S.Ct. 482 (1994).
 
 Pre-Indictment Delay
 
 30
 Eight years elapsed between the time of the loan and the filing of the indictment. The trial court carefully considered the Government's explanation of the delay and the defendant's assertion of prejudice. A defendant must show both prejudice and government culpability in the delay to establish a due process violation. See United States v. Sherlock, 962 F.2d 1349, 1354 (9th Cir.1989); United States v. Loud Hawk, 816 F.2d 1323, 1324-25 (9th Cir.1987); United States v. Butz, 982 F.2d 1378, 1380 (9th Cir.1993). We review the district court's ruling under an abuse of discretion standard. Sherlock, 962 F.2d at 1354.
 
 
 31
 We cannot say the court abused its discretion in denying the motion to dismiss. The Government offered a reasonable explanation relating to an extensive investigation and to circumstances where witnesses changed stories about the transactions. Moreover, it is highly questionable whether Fauria can demonstrate prejudice.
 
 Impeachment of Mary Ann Gigure
 
 32
 The panel opinion on this issue in Annigoni stated:
 
 
 33
 The Limitation on the Examination of Mary Ann Gigure. Annigoni contends that his right to cross-examine an important witness against him was erroneously restricted and that the error was not harmless. From "a common sense point of view," he urges, Gigure's use of four medications, the drowsiness they caused, and the effect that they and the "terrifying" illness she had experienced might have had on her memory should have been explored before the factfinders who were to determine Gigure's credibility. As Gigure was the key witness on the disbursement of the Bank loan, she was a significant witness against him. If she were not believed, the government's case against him would have been seriously damaged. Annigoni reminds us of our exhortation to allow "full and fair cross-examination of government witnesses whose testimony is important to the outcome of the case." United States v. Brooke, 4 F.3d 1480, 1489 (9th Cir.1990).
 
 
 34
 The examination the court permitted of Gigure was less than full, but we are not persuaded that it was less than fair. Nothing produced at the in limine hearing suggested that she had suffered any impairment of memory or that her medications or illnesses would have impaired her memory. Her testimony, both at this hearing and at the trial itself, was crisp and clear, that of a professional recalling a professional job. It is true that some prosecutors would not have sought to exclude examination as to her medical conditions and medications, and some trial judges would not have granted the exclusion. It may even be that such prosecutors would have been wise in avoiding the ground for an appeal, and such judges would have been astute in providing no basis for a challenge to the verdict. Nonetheless, the court's decision was essentially a decision on relevance; it was a call to be made by the trial judge. We have no firm conviction that he was wrong.
 
 
 35
 Annigoni, 68 F.3d at 282.
 
 
 36
 Fauria raises the same issue. Ordinarily, we would be guided by the panel opinion in Annigoni. Because of the award of a new trial on other grounds here, we need not resolve the issue in this opinion.
 
 
 37
 The restriction of cross-examination of Gigure may have been more prejudicial to Fauria than his co-defendant. There existed an intimate personal relationship, as well as an employer-employee relationship, between Gigure and Fauria. That relationship ruptured under trying circumstances. She initially exonerated Fauria from wrongdoing; then later changed her story. The prior panel opinion indicated that the cross-examination permitted by the court was "less than full, but ... not ... less than fair." Id. This issue for retrial may be raised anew and reconsidered.
 
 
 38
 We REVERSE and REMAND for a new trial consistent with this opinion.
 
 
 
 *
 The Honorable Myron H. Bright, Senior United States Circuit Judge, Eighth Circuit Court of Appeals, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3