106 F.3d 411
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Douglas L. TAYLOR, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Scott K. CLAWSON, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
James B. HELM, Defendant-Appellant.
 Nos. 95-50032, 95-50034 and 95-50036.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 14, 1996.
Decided Dec. 27, 1996.
 
 Before: FARRIS, BRUNETTI and KOZINSKI, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 I. Helm.
 
 
 3
 The evidence, viewed in the light most favorable to the prosecution, was sufficient to support defendant's convictions for conspiracy, mail fraud, and embezzlement. From late 1987 until mid-1988, Rubell Helm Insurance Services, Inc. (RHIS) promised to secure aggregate stop-loss insurance for three of the five plans mentioned in the indictment. Gov't Ex. 1 at 4-5 (CABE) [3 Helm SER at 494-95]; Gov't Ex. 165 at 2 [5 Helm SER at 1298] & R.T. at 1340 (Donald Sharp) (BEHT); Gov't Ex. 232 (UAW) [6 Helm SER at 1375]. The promises to the other two during the same period were somewhat more nebulous, [compare Helm's Opening Br. at 9 & 10-11, with Gov't Br. at 17-18 & 21] but taking Helm's version as true, both were at least promised a self-funded trust with stop-loss insurance in place on their effective dates. R.T. at 981-82 (Frank Andrew Peterson, Jr.) (ATIP 1041); 2156-57 (James Helm) (ATIP 1041); 2074-75 (James Helm) (ATIP 1048); Gov't Exs. 285 & 286 (exchange of letters regarding ATIP 1048 establishing expectation of "fully insured program" covered by "Fidelity Security" through RHIS's "European re-insurance slip"). In each case, evidence established that the insureds paid into the plans and their payments were, in turn, diverted into RHIS accounts under the guise of paying the premiums on nonexistent insurance. See, e.g., Gov't Ex. 83 at 31 [3 Helm SER at 672] (CABE); Gov't Ex. 146, [4 Helm SER at 970] (ATIP 1041); Gov't Ex. 210, [6 Helm SER at 1364] (BEHT); Gov't Ex. 256 at 7 [6 Helm SER at 1395] (UAW); Gov't Ex. 301 at 8 [6 Helm SER at 1429] (ATIP 1048).
 
 
 4
 The jury was entitled to infer that Helm was well aware of both the promises and the bills. R.T. at 1675 (testimony of Marilyn Tabor) (no checks issued at RHIS without James Helm's direction); id. at 2053 (testimony of James Helm) (Helm "would have seen" proposal to be presented to prospective client even if he didn't present it). There was also ample evidence to support an inference that Helm knew RHIS had no domestic carrier to front its 1987 reinsurance slip after July 1987, Gov't Ex. 325 [6 Helm SER at 1519], and no reinsurance slip at all in 1988, Helm's Opening Br. at 12-15; R.T. at 1269-70 (George John Bereska) (Fidelity Security never agreed to front reinsurance slip); id. 1195-98 (Lawrence Warfield) (Diamond Benefits never agreed to front reinsurance slip).
 
 
 5
 As to the embezzlement counts, evidence showed that funds were illegally transferred from ERISA trusts into RHIS general accounts, see supra, and that RHIS paid defendant's salary and numerous personal expenses. Id. at 1677, 1684, 1826 (Tabor); 2191-92 (Helm).
 
 
 6
 The evidence was sufficient to support Helm's conviction for willfully subscribing to a false tax return. Marilyn Tabor testified that Helm's personal expenses were simply paid by RHIS and characterized by RHIS as "consulting fees," not loans. Id. at 1677, 1684-85, 1826. She also testified that Helm rejected her suggestion that these consulting fees be reported on a form 1099 as non-salary income, id. at 1709-11, 1792-93, 1847-48, and that he never reimbursed the company for any of these payments, id. at 1858. The jury was entitled to infer that Helm had no intention of paying back the money and, thus, willfully failed to report it as income.
 
 
 7
 The evidence wasn't sufficient to convict Helm of paying David Erlandson kickbacks to influence operations of an ERISA plan. Although Erlandson plead guilty to receiving such a kickback, testified that he was influenced by the payments, R.T. at 136, and may have helped conceal RHIS's wrongdoing, id. at 136, 211-12, 214, he never testified that anyone at RHIS intended to influence him. Erlandson was the government's witness, testifying not only under pain of perjury but also with the hope of more lenient sentencing for full cooperation. Id. at 123. If the government was unable to get direct and non-self-contradicted testimony out of him to the effect that James Helm at some point explicitly or implicitly evinced an intent to use apparently legitimate commission payments to influence his actions, no rational jury could escape a reasonable doubt that Helm had such intent.
 
 
 8
 Erlandson had obtained a broker's license at the behest of the Southern California Builders Association (sponsors of CABE) for the specific purpose of accepting split commissions on insurance he obtained for SCBA. Id. at 172-73. It was, thus, perfectly legal for him to split the commission of Ken Brown, the agent who brought RHIS to SCBA. Erlandson testified that Brown insisted the split to be paid to Erlandson directly by RHIS, rather than through Brown, because Brown wanted to avoid tax liability and administrative burdens. Id. at 174-76. He also testified that the commission was based on a standard industry formula, id. at 178, and that no one at RHIS ever discussed with him why he was receiving the commissions, id. at 190. Hank Muir, a CABE trustee, testified that the Board fired Erlandson when it found out about the payments, not because they were bribes but because the Board felt he had broken an agreement to share his commissions with the SCBA. Id. at 119, 121-22. The commission payments, on their face, thus appeared wholly legal and legitimate.
 
 
 9
 The government points out that Erlandson's commissions weren't reported to the CABE Board with other broker's commissions. Gov't Br. at 27. In the same breath, however, it admits that Brown's commissions also went unreported. The reason is apparent. The brokers whose commissions were reported to the CABE Board were paid by the plans for bringing new employers to it. Brown and Erlandson were paid by RHIS for bringing CABE to it. As the Brown/Erlandson commission was an RHIS expense, paid in consideration of a benefit to RHIS, it would have been surprising had it been reported to CABE.
 
 
 10
 The district court didn't abuse its discretion by admitting testimony that Helm's codefendants had expressed concern about RHIS's business practices. The testimony was carefully sanitized to avoid mention of Helm's name and was incriminating only with reference to other admissible evidence introduced at trial that directly implicated Helm. Accordingly, the district court effectively removed this testimony from the narrow exception created in Bruton v. United States, 391 U.S. 123 (1968), to the general rule that evidence inadmissible against one co-defendant may be admitted, with a limiting instruction, against another. See Richardson v. Marsh, 481 U.S. 200, 208-11 (1987). Helm had a right only to a limiting instruction, a right he admittedly made a tactical decision to forgo. Helm Br. at 29.
 
 
 11
 Whether or not the district court abused its discretion by admitting Mark Scerra's estimate of the unpaid claim backlog, we must nonetheless affirm if we can say with "fair assurance" that admitting the estimate didn't change the outcome of the trial. See United States v. Brooke, 4 F.3d 1480, 1488 (9th Cir.1993). Given that the amount of unpaid claims wasn't an element of the crime and was, at best, only marginally relevant to the government's case, any error was harmless.
 
 
 12
 The district court didn't clearly err in calculating the amount of loss for sentencing purposes. Helm's expert accountant purported to reduce the amount of loss by excluding the $26.95 premium fee several of the plans contracted to pay RHIS. R.T. at 2234 (Leonard Warren Hodnett). The essence of the fraud charge, however, was that Helm caused the plans to pay these agreed premium fees while concealing the absence of the promised insurance they were intended to cover. Including the premium fees in the amount of loss was, therefore, consistent with a "realistic, economic approach to determining what losses [Helm] truly caused or intended to cause." United States v. Harper, 32 F.3d 1387, 1392 (9th Cir.1994). Subtracting the additional $300,000 of miscellaneous adjustments Helm urges upon us from the $3.4 million figure used by the district court yields $3.1 million in losses. This adjusted amount of loss, however, results in the same twelve-point increase Helm received under the district court's calculation. See United States Sentencing Commission, Guidelines Manual app. C amend. 99 (November 1, 1989). Any error was therefore harmless.
 
 
 13
 II. Taylor.
 
 
 14
 The government didn't present evidence sufficient to prove beyond a reasonable doubt that Taylor had knowledge of the schemes to defraud and embezzle, let alone specific intent to defraud and embezzle. There was no testimony indicating that Taylor was involved in procuring insurance and no evidence that he knew what insurance RHIS may or may not have obtained. As the government points out, he did provide the RHIS billing department with the information necessary to generate invoices pursuant to which money was transferred from trust accounts to RHIS accounts. The evidence showed, however, that he calculated the amounts due based on constant, contract rates for the promised insurance and a monthly tally of the number of people covered. R.T. at 1753 (Tabor). This evidence was insufficient to show that Taylor knew whether RHIS was, in fact, paying premiums for particular plans at the promised rates, let alone that he knew whether RHIS had not contracted for the insurance that would obligate it to pay such premiums.
 
 
 15
 Evidence that he generally had "knowledge of what was going on financially with the company," id. at 745 (testimony of Kathleen Helm), wasn't enough to prove he knew of RHIS's wrongdoing. The plans mentioned in the indictment were hardly the only clients of RHIS, R.T. at 2051 (uncontroverted testimony of James Helm); Gov't Ex. 434. [6 Helm SER at 1570-71], and Taylor may have simply not noticed the discrepancies amidst a large volume of receipts and expenditures. Marilyn Tabor, for instance, a much more experienced accountant than Taylor who worked under him at RHIS, testified that she had responsibility for "all the accounts" at RHIS. R.T. at 1857. Although she noticed and complained at the time about various improprieties at RHIS she never mentioned the rather subtle absence of expenses that, technically, she also should have expected to find in the accounts to which she had access.
 
 
 16
 Taylor may have been naive, foolish, or imperceptive; he may have been a knowing participant. The evidence was insufficient for a rational jury to decide beyond a reasonable doubt.
 
 
 17
 III. Clawson.
 
 
 18
 The evidence was sufficient to prove Clawson had the requisite intent to commit the charged crimes. A conspiracy conviction requires proof of two elements: (1) defendant's agreement to accomplish an illegal objective, and (2) an overt act taken in furtherance of the agreement. See United States v. Lothian, 976 F.2d 1257, 1261 (9th Cir.1992). In this case, the illegal objective, mail fraud, requires knowing participation in a scheme to defraud by use of the mail with intent to defraud. See United States v. Bonanno, 852 F.2d 434, 440 (9th Cir.1988), cert. denied, 488 U.S. 1016 (1989). The key to each conviction was, thus, proof of knowing participation in a scheme to defraud and intent to defraud. To convict defendant of conspiracy, the government had to prove this intent with respect to at least one of the plans. To convict him of the individual mail fraud counts, it had to show intent to defraud with respect to each scheme.
 
 
 19
 The first scheme concerned the CABE plan. RHIS began discussions with the eventual CABE plan sponsors as early as August 1987. R.T. at 2052 (testimony of James Helm). By the time defendant prepared and submitted RHIS's bid for the business in late September, Gov't Ex. 2 at 2 [3 Helm SER at 497], he knew the new insurance coverage would have to be in place by November 1. Gov't Ex. 7. [3 Helm SER at 582] RHIS's bid quoted rates, Gov't Ex. 5, and specifically contemplated reinsurance through the Boston Mutual Life Insurance Company (BMLIC). Gov't Ex. 2 at 2 [3 Helm SER at 497] [3 Clawson ER].
 
 
 20
 At the time, however, RHIS had no domestic stop-loss coverage lined up for CABE. It did have a foreign reinsurance slip that allowed it to bind stop-loss insurance for self-insured medical plans. Clawson Ex. 2050. [3 Clawson ER] Two conditions had to be met, however, before the slip would cover a given risk: First, a domestic insurance company, acceptable to the reinsurers, had to have agreed to front the slip. Id. Second, a designated third-party evaluator had to pre-approve the proposed coverage and terms. Id. But RHIS neither had a domestic front from the late summer of 1987 until the slip expired, Gov't Ex. 324. [6 Helm SER at 1517], nor did it present the CABE plan to the third-party evaluator for the required approval at any time before defendant left RHIS. R.T. at 1307 (Christopher Hutton).
 
 
 21
 No insurance was in place on November 1, 1988, when CABE's preexisting insurance expired. In January 1988, RHIS did apply to BMLIC for group life insurance and aggregate and specific stop-loss insurance. R.T. at 307 (Jeffrey Michael Daly). BMLIC denied the application for aggregate stop-loss insurance immediately, id. at 240-41, and denied group life insurance in March 1988, Gov't Ex. 36. [3 Clawson ER] In March 1988, after considerable negotiation, BMLIC did agree to provide specific stop-loss coverage, backdated to December 1, 1987 (one month after the previous insurance expired). R.T. at 245-46 (Daly).
 
 
 22
 Clawson claims that, when he presented RHIS's bid, he had every intention of securing the promised insurance by the effective date and every reason to believe that he could. Even if the evidence was insufficient to prove beyond a reasonable doubt that Clawson was scheming to defraud CABE from the first day, however, his conviction doesn't necessarily fail. The indictment charged him not only with fraudulently inducing CABE to hire and pay RHIS but also with concealing from CABE that RHIS had not secured insurance by the plan's effective date; that the insureds were thus falsely billed for the cost of paying insurance premiums; that, in the absence of any premium obligations, RHIS was siphoning money for premiums out of the CABE trust account into RHIS accounts; and that RHIS was taking large, unauthorized advances on its fees from the trust accounts. First Superceding Indictment at 6-8. [1 Clawson ER]
 
 
 23
 Clawson first argues that there was no evidence he knew that RHIS had lost its fronting carrier earlier in 1987 or that a fronting carrier was anything more than a formality. Throughout this period, Clawson supervised RHIS's underwriting department, R.T. at 721 (Kathleen Helm), and was one of the people in charge of obtaining insurance coverage, id. at 826. He was involved in negotiating RHIS's foreign reinsurance from 1986 until 1988, id. at 530-31, 544-45; Clawson's Exs. 2052 & 2053, [3 Clawson ER] and was aware of the need for a domestic fronting company, King Dep. at 11. [1 Clawson ER] In 1987 and 1988, in fact, he was involved in the search for a new fronting company, id. at 19-20 [1 Clawson ER]; Gov't Ex. 401, [1 Clawson SER at 118] and in late 1987 he told Kathleen Helm not to worry about the absence of a fronting company or aggregate stop-loss insurance for CABE because he and others were "taking care" of it. R.T. at 826-27 (Kathleen Helm). The jury was justified in inferring from this evidence that defendant knew there was no life insurance until mid-1988, no front for the reinsurance slip in 1987, and no front or reinsurance slip in 1988, and that he knew the significance of these facts.
 
 
 24
 Clawson was at the center of RHIS's relationship with CABE from its inception until he left. His signature was necessary for RHIS to write a check on the CABE trust accounts without bringing it to the attention of CABE board members, Gov't Ex. 462, [8 Helm SER at 1613-15] and he signed many such checks, made payable to RHIS for insurance he knew didn't exist. Gov't Exs. 83 at 2 (invoice) & 84 at Q-22 (check), 83 at 4 (invoice) & 84 at Q-23 (check), 83 at 5 (invoice) & 84 at Q-24 (check), 83 at 6 (invoice) & 84 at Q-25 (check), 83 at 7 (invoice) & 84 at Q-26 (check), 83 at 8 (invoice) & 84 at Q-50 (check), 83 at 9 (invoice) & 84 at Q-49 (check), 83 at 12 (invoice) & 84 at Q-28 (check).
 
 
 25
 Moreover, there was evidence of Clawson's direct involvement in concealing facts from the CABE Board. Although he apparently objected to an $80,000 advance James Helm took from the CABE trust account by forging defendant's signature while he was away, R.T. 557-59 (Kathleen Helm), he later removed a description of this and other advances Kathleen Helm attempted to put in RHIS's next report to the CABE Board, because "it wasn't the time to address the advance fees." Id. at 837. He also helped arranged for RHIS to pay from RHIS accounts a CABE life insurance claim that had been denied by BMLIC after the employer submitted it with the false policy number RHIS had supplied. Id. at 332-35 (Charalee Griffin); Gov't Ex. 42. [3 Clawson ER] Finally, and most importantly, Clawson not only sold the CABE plan but also represented RHIS at nearly every monthly meeting of the CABE Board of Trustees and never once mentioned these irregularities. Gov't Ex. 2. [3 Helm SER at 503, 506, 508, 514, 516, 518, 522, 524] This evidence was substantial enough to support a jury's inference that defendant intended to participate in a scheme to obtain money from the CABE employers by fraud.
 
 
 26
 RHIS began discussing the block of business that would become American Trust Insurance Plan (ATIP) as early as February 1988. ATIP was to be effective as of April 1. R.T. at 924-26 (Kevin Randal Burt); Gov't Ex. 107. [Helm SER at 875] At some point, RHIS decided to make ATIP a self-insured trust, covered by stop-loss insurance. R.T. at 980-82 (Peterson), 2156-61 (James Helm). In the meantime, with Clawson's help, RHIS represented to the previous carrier, Diamond Benefits Life Insurance Company, and the prospective insureds that the new carrier would be the American Trust Insurance Company (ATIC). Id. at 927 (Burt), 968-70 (Peterson); Gov't Ex. 107. [Helm SER at 875] After RHIS, represented in part by Clawson, R.T. at 927 (Burt), convinced Diamond in early February that it had the new insurance lined up, id., the two companies arrived at suitable terms of sale. Gov't Exs. 102-03. [4 Helm SER at 866-67] Diamond then sent out letters announcing termination of coverage and referring insureds to an enclosed letter from RHIS offering identical coverage on identical terms. Gov't Ex. 104. [3 Clawson ER] In a March 11 letter from defendant, the employers were instructed to send a "premium check" to the "Rubell Helm American Trust Insurance Plan" immediately, in order to secure continuous, unchanged coverage. Gov't Ex. 107. [4 Helm SER at 874]
 
 
 27
 In fact, ATIC didn't even arguably agree to insure until March 29, Gov't Ex. 109, [3 Clawson ER] and, by then, its viability was already in grave doubt. R.T. at 2157-60 (James Helm). Any coverage there might once have been was definitely gone by mid-April when ATIC rescinded coverage. Id. at 968-70 (Peterson). From then until defendant left RHIS, ATIP remained uninsured.
 
 
 28
 The government argues that defendant intentionally participated in a scheme to obtain money under false pretences through the March 11 letter. Defendant edited that letter and sent it out under his name. R.T. at 1003 (Peterson). He also instructed Frank Peterson, who was charged with various administrative duties in setting up and running the plan, id. at 970, to tell all callers that the plan would be insured by ATIC. Id. at 968. Defendant argues, however, that this evidence reflects nothing more than his good faith belief, at the time, that insurance would be in place on April 1 and that ATIC would provide it. Viewed in the light most favorable to the prosecution, the letter was calculated to give the impression that RHIS had an insurance plan in place, covered in some way (whether fully or by life insurance and stop-loss policies) by ATIC, which employers could join by sending the required documents and payment.
 
 
 29
 There was evidence defendant knew this not to be the case. On March 29, he flew to Atlanta to secure an informal letter from ATIC agreeing to "assum[e] all financial risk writing ... and ... become the insurance company of record ... in the State [sic] of Florida and California." Gov't Ex. 109. [3 Clawson ER] Defendant argues that the March 29 letter proves he believed insurance was in place on April 1, 1988 and, thus, precludes any scheme to defraud. But the March 29 letter merely shows that, he knew that no insurance was yet in place to provide "automatic coverage" for employers who had already sent in money. The jury was entitled to infer that defendant was also aware on March 11 that no insurance was in place, but nonetheless sent out a letter soliciting money for "automatic coverage." This inference is strengthened by the absence of any documents or testimony indicating that RHIS had, at any time before March 29, 1988, ever established a self-insuring trust for ATIP, or that it ever obtained, or even applied for, tentative quotes or commitments from ATIC which could have formed an honest basis for its March 11 promises of coverage. Under the circumstances, a rational jury could have concluded beyond a reasonable doubt that defendant knew of and intentionally participated in RHIS's solicitation of money from the ATIP insureds under false pretences.
 
 
 30
 The United Auto Workers (UAW) plan's life insurance and stop-loss insurance were to have been effective May 11, 1988. Gov't Ex. 232. By that time, RHIS had in place specific stop-loss insurance and life insurance. Gov't Exs. 240, 242. It also had an informal commitment, subject to conditions, from Fidelity Security Life Insurance Company to front for foreign aggregate stop-loss reinsurance. Gov't Ex. 332. Some time after defendant left RHIS, that commitment fell through. R.T. 1269 (testimony of George Bereska), although the record reveals no prior indications that it would.
 
 
 31
 On May 10, 1988, defendant represented to the UAW that "[a]ggregate stop loss insurance [would] be provided to the [UAW] Plan by Fidelity Security Insurance Company," effective as of midnight that night. Gov't Ex. 232 at 2. [3 Clawson ER] Defendant argues that he acted in good faith, relying on an April 29 letter from Fidelity Security confirming that it was "favorably entertaining" fronting a foreign reinsurance slip for RHIS. Gov't Ex. 332. [3 Clawson ER] The reinsurance slip in question, however, was to be effective June 1, 1988, Clawson Ex. 2055; [3 Clawson ER] King Dep. at 97. [1 Clawson ER] Under the circumstances, a rational jury could also have concluded that defendant obtained money for RHIS by making intentional misrepresentations that insurance coverage was in place when, in fact, it was not.
 
 
 32
 As the evidence was sufficient to support a jury's conclusion that defendant had the requisite intent with respect to each of the mail fraud charges, it was, a fortiori, sufficient to support a similar finding for conspiracy to commit mail fraud.
 
 
 33
 Finally, Clawson claims that the district court improperly denied his repeated motions for severance. On appeal from a denial of a motion to sever, a defendant bears the burden "to show that joinder was so manifestly prejudicial that it outweighed the dominant concern with judicial economy and compelled exercise of the court's discretion to sever." United States v. Armstrong, 621 F.2d 951, 954 (9th Cir.1980). The defendant can sustain this burden only by showing
 
 
 34
 violation of one of his substantive rights by reason of the joint trial: unavailability of full cross-examination, lack of opportunity to present an individual defense, denial of Sixth Amendment confrontation rights, lack of separate counsel among defendants with conflicting interests, or failure properly to instruct the jury on the admissibility of evidence as to each defendant.
 
 
 35
 United States v. Escalante, 637 F.2d 1197, 1201 (9th Cir.1980).
 
 
 36
 Defendant argues he was prejudiced by joint trial because he was precluded from presenting freely various witnesses who would have testified that he had come to them shortly before and immediately after his resignation and expressed his worries and suspicions about the business practices of RHIS and its principals. The trial court, while not precluding this testimony, restricted it severely for a combination of reasons, including the possibility that testimony as to statements of the defendant might tend to incriminate his co-defendants in violation of Bruton v. United States, 391 U.S. 123 (1968).
 
 
 37
 As a result of these problems, witnesses were allowed to testify that defendant had come to them and expressed concerns about the situation at RHIS, but weren't allowed to recount the details of those concerns. For instance, Don Sharp, the insurance agent of record for one of RHIS's plans, was prepared to testify that, after defendant resigned from RHIS, he called Sharp, urged him to make sure his plan's reinsurance was actually in place, and said that he suspected James Helm and Michael Rubell were misappropriating the plan's premiums. R.T. at 1335. At trial, however, Sharp was only allowed to answer affirmatively when asked whether "he was concerned about how things were going at Rubell-Helm." Id. at 1335, 1346, 1362. Defendant argues that these limitations made his warnings and expressions of concern sound so tepid that they deprived his actions of their real meaning. But it isn't clear that more detail about defendant's warnings would have strengthened his defense because the testimony bore more than one possible interpretation. A jury favoring defendant could have considered it proof he wasn't in the conspiracy. A jury disfavoring defendant, however, could have seen these statements as signs of a conspirator getting cold feet and hoping to distance himself from the downfall of his fellows.
 
 
 38
 Even assuming that more details would have worked to defendant's advantage, however, the limitations imposed didn't significantly hamper his defense. In the case of Don Sharp, for instance, defendant was able to specify the type of "concern" he had expressed by asking Sharp whether "[his plan] terminated its relationship eventually with Rubell-Helm, in part, based on the communication by Scott Clawson that he had resigned and that he had some concerns about the manner in which Rubell-Helm was being operated." Id. at 1367. The prejudice was, thus, not so clear and manifest that severance was the only rational choice available to the district court.
 
 
 39
 The conviction of defendant Helm is AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR RESENTENCING. The conviction of defendant Taylor is REVERSED. The conviction of defendant Clawson is AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3